**SIGNED.**

Dated: November 22, 2010



_____
**RANDOLPH J. HAINES**
**U.S. Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOOP 76, LLC, an Arizona limited liability company, | ) ) ) | CASE NO. 2:09-bk-16799-RJH |
| | ) | OPINION DENYING CLASSIFICATION |
| Debtor. | ) | OBJECTION |
| | ) | |

The secured creditor has objected that the Debtor's pending plan of reorganization violates § 1122[1] by classifying the creditor's guaranteed deficiency claim separately from the unguaranteed trade vendor claims. Based on the language, structure and purpose of § 1122, interpreted in light of the history under the Act, Ninth Circuit case law under the Code and the legislative intent of § 1129(a)(10), the Court finds and concludes that evidence may demonstrate that a debt for which there is another source of repayment is not substantially similar to debts lacking such alternative sources of payment. If the preponderance of the evidence at the confirmation hearing supports that conclusion, then § 1122(a) requires that debt to be separately classified.

**Factual and Procedural Background**

This is a single asset real estate case. The Debtor, Loop 76 LLC, owns a specially designed office complex intended to provide both retail and showroom facilities and office space for real estate construction and design businesses. The building is subject to a lien in favor or Wells Fargo Bank, N.A. There is no dispute that Wells Fargo is undersecured. The Debtor's plan treats Wells Fargo's total claim of approximately $23 million as being a secured claim in

---

[1] Except as otherwise indicated, as citations are to the to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

the amount of approximately $17 million in class 2, and an unsecured deficiency claim in the amount of $6 million in class 8(B).

For purposes of this opinion, the only other relevant classes are class 3, consisting of a secured claim of Genesee Funding in the amount of $7,865, secured by a Griphoist (equipment used for window washing), and the unsecured trade vendor claims in class 8A. According to the Debtor's ballot report, both of those classes accepted the plan. The final, evidentiary confirmation hearing is set for two days starting on December 7, 2010.

Wells Fargo objected to the classification of the Genesee Funding claim, arguing that it was either not a valid claim at all or that it was not a valid secured claim. The Court has denied those objections to the classification of the Genesee Funding claim in class 3, and Wells Fargo has filed an interlocutory appeal of that ruling.

Wells Fargo has also objected to the separate classification of its deficiency claim in class 8(B), contending it must be classified together with the trade vendor claims in class 8(A). The effect of this objection, if sustained, would be to cause class 8 to reject the plan. And if Wells Fargo is also ultimately successful on its appeal of the denial of its objection to the acceptance by Class 3, this would mean that there would be no impaired class accepting the plan, as required by § 1129(a)(10). Wells Fargo purchased claims in all other classes that could have provided another accepting impaired class, and voted them against the plan.

The primary basis for Wells Fargo's objection is that its unsecured deficiency claim must be classified together with the unsecured trade vendor claims. Conceding this single classification is not technically required by the language of § 1122, Wells Fargo argues that it is required by the anti-gerrymandering and business justification requirements that it argues were established by the Ninth Circuit in *Barakat*[2] and by the Ninth Circuit Bankruptcy Appellate

---

[2] *Barakat v. The Life Insurance Company of Virginia (In re Barakat)*, 99 F.3d 1520 (9th Cir. 1996).

2

Panel in *Montclair*[3] and in *Tucson Self-Storage*.[4] The Debtor responds with a couple of arguments why this classification scheme does not constitute gerrymandering[5] and also advances some arguments why the Wells Fargo deficiency claim is not "substantially similar" to the trade vendors' claims. In particular, Debtor relies on the fact the Wells Fargo deficiency claim is guaranteed by the Debtor's principals, whereas none of the trade vendor claims is so guaranteed.

**Analysis**

Section 1122(a) provides, subject to an exception not relevant here: "A plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Logically, the meaning of this provision is exactly the same, but perhaps more readily understood, when stated in the form of its contrapositive: "A plan may ***not*** place a claim or an interest in a particular class [] if such claim or interest is ***not*** substantially similar to the other claims or interests of such class." In other words, what § 1122(a) requires is that dissimilar claims must be placed in different classes.[6]

Almost all of the analysis and case law concerning § 1122(a) has addressed the extent to which it permits substantially similar claims to be placed in separate classes. It is that issue that has given rise to a number of interpretive rules, such as those prohibiting "gerrymandering" for the sole purpose of satisfying the accepting impaired class requirement of

---

[3] *Montclair Retail Center, LP v. Bank of the West (In re Montclair Retail Center, LP)*, 177 B.R. 663 (9th Cir. BAP 1995).

[4] *Oxford Life Insurance Co. v. Tucson Self-Storage, Inc.*, 166 B.R. 892 (9th Cir. BAP 1994).

[5] In particular, the Debtor argues that it is not gerrymandering because the Debtor's prior plan offered Wells Fargo full payment if it made the § 1111(b) election, and because no gerrymandering is necessary to satisfy § 1129(a)(10) in light of the acceptance by class 3, the Genesee Funding claim. Debtor also argues there is business justification for the classification because the trade vendors are necessary to provide future services to the Debtor. In light of the Court's conclusion regarding "substantial similarity" it is not necessary to reach these arguments.

[6] *In re Barakat*, 99 F.3d 1520, 1524 (9th Cir. 1996)("While dissimilar claims may not be put in the same class, the Bankruptcy Code does not expressly state whether the plan may separately classify similar claims, or whether it mush classify similar claims together."). *Accord, In re Greystone III Joint Venture*, 948 F.2d 134, 138 (5th Cir. 1991), *cert. denied*, 113 S. Ct. 72 (1992)("§ 1122(a) in terms only governs permissible *inclusions* of claims in a class rather than requiring that all similar claims be grouped together.").

3

§ 1129(a)(10), and those requiring a debtor's economic or business justification for such separate classification. That is the context in which most of the leading cases have been decided, including but not limited to *U.S. Truck*,[7] *Greystone*,[8] *Boston Post Road*,[9] *Bryson*,[10] and the Ninth Circuit's decision in *Barakat*.

That, however, is not the issue presently before this Court. Here, the issue is whether the guaranteed deficiency claim of Wells Fargo is "substantially similar" to the non-guaranteed trade vendor claims, within the meaning and intent of §§ 1122 and 1129(a)(10). The language of § 1122, the case law and the parties here unanimously agree that if claims are not substantially similar, the Code *requires* them to be placed in separate classes. Because the Code requires such dissimilar claims to be placed in separate classes, there is no basis or reason to consider the Debtor's motives underlying such classification, whether they be gerrymandering or for business reasons, because the Code requires such separate classification regardless of the Debtor's motives.

The Code does not define either "similarity" or "substantial similarity." While there is ample case law on the topic of permissible separate classification of claims that are assumed to be similar, there is a paucity of case law defining what constitutes either similarity or substantial similarity of claims.

***Johnston* Holds A Nondebtor Payment Source Renders a Claim Dissimilar.**

Indeed, the Ninth Circuit may be the only circuit that has definitive case law on the meaning of substantial similarity under the Code. In *Johnston*,[11] the Ninth Circuit affirmed a bankruptcy court's confirmation of a plan that placed Steelcase's $2 million unsecured claim in

---

[7] *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir. 1986).

[8] *In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991).

[9] *Boston Post Road, Ltd. v. Federal Deposit Insurance Corp. (In re Boston Post Road)*, 21 F.3d 477 (2nd Cir. 1994).

[10] *Travelers Insurance Co v. Bryson Properties XVIII (In re Bryson Properties)*, 961 F.2d 496 (4th Cir. 1992).

[11] *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994).

4

a different class than that of other unsecured creditors. In doing so, the Ninth Circuit made two significant holdings. First, it held that "a bankruptcy court's finding that a claim is or is not substantially similar to other claims, constitutes a finding of fact reviewable under the clearly erroneous standard."[12] Second, the Ninth Circuit concluded that "Steelcase *is* situated differently from other unsecured creditors," for some or all of three reasons on which the bankruptcy court apparently relied:

1. "Steelcase . . . unlike all others, is partially secured by collateral of [nondebtor] COS, the primary obligor;"

2. "[Stealcase], unlike all other unsecured creditors, is embroiled in litigation with Johnston, and that its claim thus may be offset or exceeded by Johnston's own claim against Steelcase;" and/or

3. "If successful in the litigation, [Steelcase] could be paid in full before all other unsecured creditors."[13]

Of these three factors, only the first seems to have any bearing on the nature of the claim or its similarity to other claims. The second factor affects only the amount of the claim that might ultimately be allowed. Except for the small "administrative convenience" claims that Code § 1122(b) specifically authorizes to be classified together and distinctly from other unsecured claims, there is no argument or authority that similarity of claims should be determined by their relative size. Indeed, the Code's specific authorization for this classification based on amount implies that but for such specific authorization classification based on amount would not be appropriate.

The third factor identified in *Johnston* is based solely on how the claim is treated under the debtor's plan, not on any characteristic of the claim itself. No analysis or authority suggests that similarity of claims should be determined according to how they are treated in the plan.

---

[12] 21 F.3d at 327.

[13] 21 F.3d at 328 (emphasis in original).

Both the second and third *Johnston* factors might provide valid *reasons* for separate classification of similar claims, because they bear on the *treatment* of the claim and Code § 1123(a)(4) requires claims to be classified in different classes if they are to be treated differently. But, as noted above, the justification for separate classification of similar claims provides no basis on which to ascertain dissimilarity, because dissimilar claims must be separately classified without respect to the plan proponent's reasons or justifications.

Consequently the only factor in *Johnston* that seems at all relevant to either the bankruptcy court's finding or the Ninth Circuit's affirmance of substantial dissimilarity is that the creditor had a non-debtor source of repayment of the claim. The Ninth Circuit's opinion emphasized the particular significance of this first factor when it stated: "Steelcase, unlike other unsecured claimants, holds a partially secured interest in COS, thereby according Steelcase different status" than the other unsecured creditors.[14]

It therefore appears that the holding of *Johnston* is that a claim that may be paid from a non-debtor source is not substantially similar to claims that lack such non-debtor source of repayment. Or, more accurately, the holding of *Johnston* appears to be that it is permissible for a bankruptcy court to find, as a matter of fact, that a non-debtor source of repayment of a claim renders it dissimilar from other claims lacking such source of repayment outside of the plan.

Wells Fargo attempts to suggest that the Ninth Circuit's subsequent decision in *Barakat* is to the contrary, and that *Johnston* applies only under "special circumstances." But as noted above, *Barakat* did not address the factual question of similarity, but rather the purely "legal issue" of whether "there is any limitation on the separate classification of similar unsecured claims."[15] And the facts in *Barakat* are entirely "distinguishable" from those in

---

[14] *Id.*

[15] *Barakat v. Life Insurance Company of Virginia (In re Barakat)*, 99 F.3d 1520, 1523 (9th Cir. 1996).

*Johnston,* as the *Barakat* opinion itself noted.[16] Most importantly, there was no nondebtor source of repayment in *Barakat*, as there is here, so it could not have addressed this factual issue. And of course one panel of the Ninth Circuit cannot reverse a prior panel's holding absent an intervening change in the law.

This analysis of the *Johnston* precedent seems to be entirely dispositive here. The debtor has made a prima facie case that the significance of the guarantee of Wells Fargo's debt by the Debtor's principals does render its claim both factually and legally dissimilar from the unsecured trade vendors' claims. For example, Wells Fargo need not be concerned about whether the plan maximizes the value of the estate and the return to creditors because it is assured of payment from nondebtor sources. If the preponderance of the evidence at the confirmation hearing supports that finding, then *Johnston* holds that to be a permissible basis for this Court to find that Wells Fargo's claim is dissimilar from other claims that lack such alternative repayment source.

To determine whether that is a sound interpretation of the *Johnston* holding, the Court will examine whether it is consistent with the language and case law under the Bankruptcy Act and the interrelated origins, purposes and effects of classification in the specific context of the accepting impaired class requirement of § 1129(a)(10).

**Code Language and *Johnston* Make the Priority of the Claim Not Determinative.**

Wells Fargo's principal argument against this interpretation of *Johnston* is that the factors that must be compared to determine similarity are limited to those that bear on the "nature" of the claim itself, and not on the identity or interests of the holder of the claim. And while "nature" is not any more precise or definitive than "similarity," Wells Fargo argues that the "nature" of a claim is determined by the "legal character or the quality of the claim as it relates to the assets of the debtor," such that "all creditors of equal rank with claims against the same property should be placed in the same class."[17] This exclusive reliance on the "nature" of the

---

[16] *Id.* at 1526.

[17]*In re Los Angeles Land and Investment Limited*, 282 F. Supp. 448, 453-54 (D. Hawaii 1968), *aff'd*, 447 F.2d 1366 (9th Cir. 1971), quoting *Scherk v. Newton*, 152 F.2d at 751.

7

claim, and the definition of "nature" as based on the legal rights to the debtor's assets, derive from cases decided under the Bankruptcy Act, particularly a 1971 Ninth Circuit opinion in *Los Angeles Land*,[18] a Tenth Circuit decision in *Scherk v. Newton* that *Los Angeles Land* quoted,[19] and a Seventh Circuit decision in *Palisades-on-the-Desplaines* from 1937.[20]

While *Johnston* did cite *Los Angeles Land*, it did not cite it for the proposition that the "nature" of a claim depends solely on its priority with respect to the debtor's assets. To the contrary, the *Johnston* court emphasized that the *Los Angeles Land* opinion specifically rejected that narrow, technical definition of the "nature" or a claim, but rather "interpret[ed] analogous provision of former Bankruptcy Act to require consideration of 'nature' of claim not as that word is intended in its 'technical sense in law but [as it] is used in its ordinary common vernacular.'"[21] Moreover, there are several problems with this argument that essentially equates similarity to priority.

**The Bankruptcy Code Did Not Adopt Chapter X's Classification Rule**

All of the Act cases holding that classification hinges on the "nature" of the claims arose under Chapter X of the Act or its predecessor, § 77B.[22] Consequently they applied Chapter X's and § 77B's statutory provisions for classification: "For the purposes of the plan and its acceptance, the judge shall fix the division of creditors and stockholders into classes according to

---

[18] *Id.*

[19] *Scherk v. Newton*, 152 F.2d 747, 751 (10th Cir. 1945), *quoted at* 282 F. Supp. at 454.

[20] *Seidel v. Palisades-on-the-Desplaines (In re Palisades on the Desplaines)*, 89 F.2d 214, 217-18 (7th Cir. 1937).

[21] *Johnston*, 21 F.3d at 327, quoting *Los Angeles Land*, 282 F. Supp. at 454.

[22] *Scherk v. Newton*, 152 F.2d at 749 ("the debtor filed its petition for reorganization under Chapter X of the Bankruptcy Act"); *Palisades-on-the-Desplaines*, 89 F.2d at 215 ("This action involves a reorganization proceedings under sections 77A and 77B of the Bankruptcy Act"); .*Los Angeles Land*, 282 F. Supp. at 449 ("This matter involves a corporate reorganization proceeding under Chapter X of the Bankruptcy Act"). Wells Fargo also cites *J.P. Morgan & Co. V. Missouri Pac. R. Co.*, 85 F.2d 351 (8th Cir. 1936), which was a railroad reorganization under section 77.

8

the nature of their respective claims and stock."[23] And in dictum that was not ultimately adopted in that case, the Seventh Circuit in *Palisades-on-the-Desplaines* quoted the author of a treatise on reorganization who implied that "nature" means priority.[24]

But the Chapter X and § 77B statutory rules for classification were not the rule for Chapter XI cases. For Chapter XI plans, the Act required: "For the purposes of the arrangement and its acceptance, the court may fix the division of creditors into classes and, in the event of controversy, the court shall after hearing upon notice summarily determine such controversy."[25]

The Act's failure to require Chapter XI claims to be classified according to their nature necessarily means the drafters intended a different rule to apply in Chapter XI. Moreover, as originally drafted, the Chapter XI arrangement could only affect unsecured creditors.[26] Because unsecured claims are generally of the same priority with but a few exceptions, this implies it was not the drafters' intent to require Chapter XI claims to be classified only according to priority. Rather, the implication is that the Chapter XI plan proponent could classify claims on some basis other than according to the "nature," and thus on a far more flexible basis than according to the priority of the claims. The definitive authority under the Act, Colliers' 14th Edition, confirms that the classification rule under Chapter XI was intended to be so flexible that the court had no authority to order a reclassification from what the debtor proposed, but only to

---

[23] Bankruptcy Act § 197. The *Palisades-on-the-Desplaines* opinion makes clear the statutory language in the predecessor § 77B was virtually identical: "[T]he statute provides that for the purposes of the plan and its acceptance, the judge shall determine the divisions of creditors and stockholders into classes according to the nature of their respective claims and interests." 89 F.2d at 217.

[24] The appellant was arguing what is accepted law today, that every creditor secured by a lien on different property should be in its own class. The Court said: "There is much in appellant's contention to commend it to our serious consideration. His position is based upon the interpretation of that part of the statute here involved, by Mr. Gerdes in his work on Corporate Reorganization (1936), vol. 2, Sec. 1046, p. 682: 'All creditors of equal rank with claims against the same property should be placed in the same class. This is natural, logical, and a simple basis of decision. Conversely, creditors of different rank, or creditors of the same rank but with claims against different properties, should be placed in different classes.'" 89 F.2d at 217.

[25] Bankruptcy Act § 351.

[26] 9 COLLIER ON BANKRUPTCY ¶ 7.01[2], at 7 (14th ed. 1978)("A plan under Chapter XI may deal only with unsecured debts, while a plan under Chapter X may affect secured as well as unsecured debts and the rights of stockholders.").

9

ensure that "acceptances may be properly computed and so that consideration and rights provided for by the plan may be properly distributed and vested."[27]

It is beyond dispute that the Code's Chapter 11 is a merger, amalgamation or compromise between the Act's Chapters X and XI, and it bears greater resemblance to the Act's Chapter XI than it does to the Act's Chapter X.[28]

Given the Code's deliberate use of terms in § 1122 that do not adopt Chapter X's "nature" language, or the case law interpreting it, it must be concluded that the Code did not intend classification to be based solely on the nature of the claims. And undoubtedly the most obvious alternative is to permit classification based on the needs and interests of the claimholders.

This conclusion is entirely consistent with the Ninth Circuit's holding in *Johnston*. The factor that the Ninth Circuit found to be determinative in *Johnston* – that Steelcase could be paid by the nondebtor – does not really bear on the "nature" of the claim per se. The significant fact that a nondebtor was the principal obligor of Steelcase's debt does not really affect the "legal character or the quality of the claim as it relates to the assets of the debtor." So *Johnston*'s holding necessarily rejects the "nature" of the claim, at least so defined, as solely determinative.

**The Code's Language and History Favor Flexibility**

The language of the Code similarly reflects a conscious decision not to require classification based solely on priority. If the drafters of the Code had intended classification to depend on priority, why not use the term "priority" instead of the more vague, undefined term "similarity"? Priority is carefully defined in the Bankruptcy Code, primarily in § 507. Since the Code was drafted as a unified code, it can be assumed that if the drafters had intended to refer to priority, they would have done so either by the use of that term or cross reference to the section that defines it. It is a fundamental principal of statutory interpretation that the use of a different

---

[27] *Id.* ¶ 7.01[3], at 9-10.

[28] 5 NORTON BANKRUPTCY LAW AND PRACTICE 3D §91:5, at 91-18 (2009)("The new Chapter 11 bears features of all of its predecessors, but on the whole, it leans more toward the informality and flexibility of old Chapter XI than the formal structure of old Chapter X.").

10

term implies a different meaning.

Moreover, if similarity hinged solely on priority, then it would not be a factual question. Priority is a legal issue defined by the Code. Because *Johnston* unequivocally holds that similarity is a factual question, the Ninth Circuit has effectively held that similarity cannot hinge solely on a legal issue such as priority.

Finally, it is appropriate to consider the purpose to be served by any classification rule. When a statutory term is ambiguous (and it is difficult to conceive a term more inherently ambiguous than "similarity"), it is appropriate first to consider its context under the whole Code, and then to consider any evidence of legislative history.

Both under the Act and when § 1122 was originally drafted as part of the Bankruptcy Code, classification served only two purposes.[29] First, classification is important to determine how claims are being treated and, more importantly, which claims must be treated alike. Both under the Act and the original draft of the Code, all claims in a single class must be treated alike. The second important function of classification is to determine which claims vote together. The significance of this, however, is to determine which claims may out vote which other claims. For that voting purpose, every creditor would be better off, and given greater power, if it were classified in its own class. Here, however, the context is exactly the reverse, because Wells Fargo is complaining that it was given its own class for its deficiency claim. But under the original draft of the Code (and unlike the law under the Act), this power to out vote other creditors was primarily significant because of the ability of a class to waive the absolute priority rule. Again, therefore, for this purpose creditors would be more greatly empowered by being placed in their own class because they could make their own decision to impose or waive the absolute priority rule. Consequently, the primary creditors' objections that might have been

---

[29] *Id.* "Where a plan divides creditors into classes, it is thus important for two reasons to determine the class to which a creditor belongs. The first reason is that the consideration and rights to be received by the creditor under the terms of the plan depend on the class to which he belongs, since the plan is dealing with the classes in different ways or upon different terms . . . . The second reason is that the creditor's acceptance of or failure to accept the plan, assuming he is affected and his claim has been timely allowed, is considered in determining the requisite acceptances only of the class to which he belongs, and not of the other classes."

11

contemplated by the drafters were an objection that some other creditor should not be placed in the same class with them, because such other creditor might have a reason to waive the absolute priority rule that the objecting creditor did not wish to waive. Again, however, this context is the reverse of what we have here.

When the sole function of classification is to determine which claims vote together to decide whether to impose or waive the absolute priority rule, it might make sense to adopt a similarity rule that is based on the nature or priority of the claims. But that conclusion is not as sound when the classification serves another, wholly distinct purpose.

It was late in the legislative consideration of the draft of the Bankruptcy Code that § 1129(a)(10) was added. Under the Act, there had been case law suggesting that there must always be at least one class of creditors that accepted the plan,[30] although there was no specific requirement to that effect either under the Act or under the draft of the Code being considered by Congress. But then in 1977, just prior to the Code's adoption, two bankruptcy courts confirmed

---

[30] *E.g., Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 585-86, 55 S. Ct. 854, 861 (1935)("In no case of composition is a secured claim affected except when the holder is a member of a class, and then only when the composition is desired by the requisite majority and is approved by the court. Never, so far as appears, has any composition affected a secured claim held by a single creditor.")(dictum in holding the involuntary treatment of secured debt under the Frazier-Lemke Act constituted an unconstitutional taking of property); *In re Herweg*, 119 F.2d 941, 943 (7th Cir. 1941)("We do not understand that this section (the cram down provision of Bankr Act § 461(11)] provides a substitute for an arrangement, nor that it contemplates dispensing with an arrangement when no creditors can be found to consent to it) (chapter XII); *In re Hamburger*, 117 F.2d 932 (6th Cir. 1981)("Although an arrangement . . . 'may include: the retention by the debtor of all or any part of his property' (§ 461(12)) this provision is not mandatory and cannot be availed of for the debtor's relief unless it is included in an arrangement approved by the requisite number of creditors affected (§ 466).")(chapter XII); *Kyser v. MacAdam*, 117 F.2d 232 (2d Cir. 1941)("It is improper to deprive secured creditors of the right to vote by applying § 461(11) adequate protection.") (chapter XII); *Meyer v. Rowen*, 195 F.2d 263 (10th Cir. 1952)("But, it was obviously not the purpose of Section 461, sub. 11 to dispense with an arrangement when no creditors can be found to consent to it; nor does it authorize the bankruptcy court to force secured creditors, unanimously opposed to the plan, to accept it simply because adequate protection is provided.")(chapter XII); *Taylor v. Wood*, 458 F.2d 12 (9th Cir. 1972) (the court affirmed, without comment or analysis, the referee's conclusion that "debtor's plan was incapable of confirmation under Section 467 or 468 of the Bankruptcy Act where the lone creditor affected refused to accept"); *In re Northland Construction Co.*, 2 B.C.D. 1598, 1602 (E.D. Wis. 1976) (the *Herweg* analysis, although concerned with chapter XII, applies with equal force to chapter X).

12

plans in which there was only one class of creditors, and that class objected.[31] It was in reaction to those two decisions that the real estate industry proposed the addition of § 1129(a)(10) to the Code.[32]

There is therefore no dispute that the sole purpose of § 1129(a)(10) was to require "some indicia of creditor support for the debtor's schemes."[33] There is no evidence of any legislative intent to confer on undersecured creditors a veto power by requiring that their deficiency claims always be classified with other unsecured debt so they could defeat confirmation simply by causing the plan to fail to satisfy 1129(a)(10).[34]

With the addition of § 1129(a)(10), the classification rules of § 1122 suddenly served a wholly new and different function than they ever had. When used in the context of § 1129(a)(10), the classification rules serve the purpose of determining whether there is some body of creditors who favor the plan. For that purpose, there is no inherent reason why either the "nature" of the claims or their priority should alone be determinative. This is because creditors may favor or disfavor the plans for a wide variety of reasons, many of which have nothing to do with the inherent "nature" of their claims but everything to do with the nature and interests of the

---

[31] *In re Hobson Pike Associates, Ltd.*, 3 BCD 1205 (Bankr N.D. Ga. 1977)(("There is no specific or clear statutory authority in Chapter XII that the one and only creditor, which is provided adequate protection under § 461(11) can defeat by mere opposition the plan and prevent confirmation just because the debtor has no other creditor to affirmatively accept the plan."); *In re Marietta Cobb Apartments Co.*, 3 BCD 720 (Bankr S.D.N.Y. 1977) (The *Herweg* "reading of the Act would foreclose Chapter XII as a vehicle for the rehabilitation of a debtor with one mortgagee -- the norm in a large percentage of today's cases.").

[32] *See In re Greystone III Joint Venture*, 102 B.R. 560, 565-66 (Bankr. W.D. Tex. 1989), *rev'd on other grounds*, 948 F.2d 134 (5th Cir. 1991); *In re Polytherm Industries Inc.*, 33 B.R. 823, 834 (W.D. Wis. 1983); *In re Barrington Oaks General Partnership*, 15 B.R. 952, 969-70, 8 BCD 569, 5 CBC 2d 969 (Bankr D. Utah 1981).

[33] P. Murphy, CREDITOR'S RIGHTS IN BANKRUPTCY, Section 16.11, at 16-20 (1980), *quoted in Polytherm, supra*, 33 B.R. at 835 and *Barrington Oaks, supra*, 15 B.R. at 969.

[34] "This court cannot find any particular congressional intent, either expressed or implied in Congress' sausage-making exercise, that compels the court to read together the various Code provisions in such a way as to confer on secured creditors in cases such as these the veto power for which (the secured creditor) now lobbies." *Greystone, supra*, 102 B.R. at 566.

13

creditors or the origins of their claims. Creditors may favor a plan because it provides future jobs in the community, because they may be able to do business with the reorganized debtor, or because the reorganized debtor will provide a useful product or service to the community. No law suggests those are inappropriate reasons for a creditor to vote on a plan one way or another, and in fact there is substantial case law suggesting they are entirely appropriate.[35]

Moreover, this conclusion is implied by the language of § 1129(a)(10) itself. That provision expressly prohibits the counting of acceptances by "any insider." That exclusion is manifestly based not on the nature or priority of the insider's claim, but solely upon the identity and presumed interests of the holder of the claim. Thus the language and structure of the Code also confirm that when the classification issue arises in the context of § 1129(a)(10), the interests and other relationships of the claimholder may be far more significant than the nature of the claim itself.

But insisting on classification according only to the "nature" or priority of claims may make it impossible for the court to determine whether any creditors' support for the plan exists, as Congress intended when it added § 1129(a)(10). Indeed, that is apparently the sole purpose of Wells Fargo's objection here, that it should be permitted to drown out the votes of

---

[35] *E.g., American United Mutual Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146, 61 S. Ct. 157, 162 (1940)("Neglect of that duty [of the court to ensure the plan embodies a fair and equitable bargain] is apparent here by inclusion of the vote of claims held by [the debtor's fiscal agent] in computing the requisite statutory assents"); *In re Lafayette Hotel Partnership*, 1999 U.S. App. LEXIS 23696 (2nd Cir. 1999) (unpublished) (upholding bankruptcy court's approval of plan that put claim of debtor's lessee in its own class based on factual findings that lessee was necessary to the reorganization and its noncreditor's interests and its funding of the plan made it distinct); *In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1996) (separate classification appropriate because unpaid workers, unlike the insurance company subrogated to some of their claims, could "jeopardize peaceful labor relations); *In re Jersey City Medical Center*, 817 F.2d 1055 (3d Cir. 1987) (separate classification of insured claims appropriate); *In re U.S. Truck* Co., 800 F.2d 581, 587 (6th Cir. 1986) ("the Teamsters Committee has a different stake in the future viability of the reorganized company and has alternative means at its disposal for protecting its claim"); *Kaufman County Levee Improvement Dist. No. 4 v. Mitchell*, 116 F.2d 959, 961 (5th Cir. 1941)("there should have been separate classification, whereby those creditors owning no lands [in the improvement district] could have voted and been recorded as such," distinct from the bondholders who did own land in the district); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177 (9th Cir. BAP 2003)("Assuming that the facts giving rise to CTG's claim and its rights as a creditor are substantially different from those of the other claimants in Class 5, and that the difference is significant enough to justify Debtor's dissimilar treatment of CTG's claim, the Code requires that CTG's claim be separately classified.").

14

creditors who do support the debtor's plan.  Consequently such a classification rule, derived from Chapter X of the Act where Congress did not expressly require any demonstration of creditor support for the plan, would effectively defeat the purposes of § 1129(a)(10).

Therefore when the sole issue is satisfaction of § 1129(a)(10), the classification rule should be more flexible and should be designed to enable or enhance the court's ability to determine whether some creditor support exists for the plan.  That means it is entirely appropriate to define classification, at least for this purpose, with the creditors' various and conflicting interests in mind.  And it also means it would be inappropriate to allow a single creditor with an entirely unique interest, because it can be assured of payment from non-debtor sources, to prevent other creditors from demonstrating their approval of the plan and therefore its satisfaction of § 1129(a)(10).

**Conclusion**

These conclusions are all consistent with *Johnston's* holding that similarity is a fact question that may appropriately hinge on creditors' other remedies, interests or relationships.  At the evidentiary hearing on confirmation, the parties are free to introduce evidence tending to show why the existence of the guarantee of Wells Fargo's deficiency claim either is or is not a likely significant factor affecting creditors' votes on the plan.  For example, if it can be shown that Wells Fargo has no interest in pursuing the guarantee or that the guarantors are all insolvent, then the Court might conclude that the existence of the guarantee is not an appropriate distinguishing characteristic to render the claims substantially dissimilar.

But given *Johnston's* holdings that similarity is a fact question and that the existence of a non-debtor source of recovery may be such a material fact, this Court cannot conclude, as a matter of law, that the classification of the guaranteed claim separately from non-guarantee claims is improper.  For that reason, Wells Fargo's plan objection must be denied as a purely legal matter, but without prejudice to its renewal after the evidence is in.

DATED AND SIGNED ABOVE

15
Case 2:09-bk-16799-MCW    Doc 345    Filed 11/22/10    Entered 11/22/10 17:04:37    Desc
Main Document    Page 15 of 16

Copy of the foregoing mailed/e-mailed
this 22nd day of November, 2010, to:

Mark C. Hudson, Esq.
Schian Walker, P.L.C.
ecfdocket@swazlaw.com
Attorney for Debtor

Susan G. Boswell, Esq.
Quarles & Brady, LLP
sboswell@quarles.com
Attorney for Wells Fargo Bank

Barbara Caldwell, Esq.
Caldwell Padish & Wells
bcaldwell@cpwlawyers.com
Attorney for Maricopa County Treasurer

Elizabeth C. Amorosi, Esq.
U.S. Trustee's Office
elizabeth.c.amorosi@usdoj.gov

Jennifer A. Giaimo, Esq.
U.S. Trustee's Office
jennifer.a.giaimo@usdoj.gov

 /s/ Pat Denk
Judicial Assistant