**SIGNED.**

Dated: December 21, 2010



_____
**RANDOLPH J. HAINES**
**U.S. Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LOOP 76, L.L.C., | ) | CASE NO. 2:09-bk-16799-RJH |
| | ) | |
| Debtor. | ) | MEMORANDUM DECISION |
| | ) | CONFIRMING DEBTOR'S PLAN OF |
| | ) | REORGANIZATION |

The Court made some preliminary findings and conclusions on the record at the conclusion of the testimony but prior to the parties' closing arguments,. At the conclusion of the closing arguments, the Court took the matter under advisement. The Court now makes final those preliminary findings and conclusions as stated on the record on December 8, 2010, and supplements them as follows.

**FEASIBILITY**

As is customary, the Debtor's expert presented essentially a "best case" scenario for what this property could produce, while Wells Fargo's [the creditor's] experts presented a "worst case" scenario. Both side's witnesses were credible; neither can be discounted as lacking in credibility. But neither scenario, taken alone, provides a fair picture of the most likely near-term performance of this property under good management. The truth likely is to be found somewhere in between.

Even the creditors' experts acknowledged that this is a high quality property that has been very well maintained. Those experts also acknowledged that the Debtor has been performing well in a difficult market, and probably as best as can be expected. The quality of this management, particularly during a horrendous market and in the face of both bankruptcy and a lawsuit on the guarantee, demonstrates both a management ability and a commitment to the

success of this building that constitute good evidence that the property will significantly out-perform the creditor's pessimistic projections, even if it will not perform as well as the Debtor predicts.

As noted in the Court's preliminary findings, the feasibility of the plan is substantially enhanced by both the existing and continuing guarantee of the Wells Fargo debt by a solvent guarantor and by that guarantor's commitment to fund up to $2,000,000 to cover shortfalls in the first three years, and to secure that commitment with collateral of equivalent value. That additional funding is almost sufficient to cover debt service payments even under the creditor's experts' pessimistic analysis. And even if that pessimistic prediction turns out to be completely accurate, the relatively small remaining shortfall in the projected debt service coverage would likely be made up by the guarantor in addition to his $2,000,000 commitment, because under all of the evidence that guarantee will continue in effect and the guarantor will remain solvent even considering the secured commitment to fund the Debtor.

For these reasons, and because Code § 1129(a)(11) does not require a guarantee of success, the Court finds and concludes that the plan is feasible and not *likely* to be followed by the liquidation or further financial reorganization.

**INTEREST RATE**

One of the primary issues concerning this plan is the interest rate to be paid on the Wells Fargo secured claim, with the Debtor proposing a rate near both prime and the existing contract rate of 3.25%, and Wells Fargo proposing a rate in excess of 9.00%. The Court finds and concludes, as stated in its preliminary findings, that an interest rate of 6.5% is sufficient to satisfy § 1129(b)(2)(A)(i)(I) as interpreted in *Till*.

The Court notes that the payment of the debt pursuant to the plan is far less risky than was the construction loan made by Wells Fargo in 2005, at a rate of 3.25%. Moreover, Wells Fargo's expert confirmed that interest rates have not significantly moved since 2005, so the change in the general market would not justify an increase of that rate to 6.5%.

The Court finds a lack of credibility to the analysis of Wells Fargo's experts' attempts to justify a risk factor based on analogizing portions of the debt to mezzanine financing

2

or an equity investment.  The risks involved in such investments are not equivalent to those borne by a debt that is fully secured by a high quality, income producing property whose value is not disputed.  And in this case, even the risks ordinarily associated with such a first lien debt are further reduced by the guarantee of a solvent guarantor.  While ordinarily there is significant increased risk with a 100% loan-to-value loan as compared to an 80% LTV loan, with the credit enhancement represented by the guarantee of a solvent guarantor, the Court finds and concludes that this additional risk of a 100% LTV loan does not merit an upward adjustment of any more than 1% from the market rate for the first lien loans that are generally available in the market.  And the risk of a debt that is both fully secured by a quality income-producing building of undisputed value and that is guaranteed by a solvent guarantor is certainly not *double* the risk of a construction loan before the actual quality of the building, its performance, its value or its management could actually be known.

On the other hand, the Debtor makes a good case that with a solvent guarantor, perhaps a rate equal to prime would be sufficient, since that is the rate for an unsecured loan to a credit-worthy borrower.  Certainly the Debtor made a good case that bank regulators would recommend that Wells Fargo agree to a loan modification at an interest rate in the range of prime.  This evidence when applied through the prism of *Till* suggests that prime might be sufficient.  What drives the Court's conclusion, however, is that both the Code and *Till* indicate the rate must be that which the market would require to provide a present value, and the evidence here suggests the market would treat this debt as no less risky than an ordinary 100% LTV loan secured by quality collateral.

**NEW VALUE**

Despite the guarantor's secured commitment to cover shortfalls up to $2,000,000 during the first three years, the law seems clear that the only "new value" that may be considered for the new value corollary to satisfy Code § 1129(b)(2)(B)(ii) is that which is funded by the effective date.  In this case, that amount is, based on the evidence, almost $1,000,000.

In *Ambanc*, the Ninth Circuit indicated that the substantiality of a new value commitment should be measured in comparison to the amount of the unsecured debt or the

3

amount of the debt being discharged. Although there certainly may be theoretical problems with this analysis, it is the best we have. Here, a new value commitment with a value of almost $1,000,000 as compared to unsecured debt of approximately $5,000,000 clearly satisfies the "substantiality" of the new value corollary as interpreted in *Ambanc*.

Three of the elements of the new value corollary are essentially uncontested. It is undisputed that the $1,000,000 commitment represents "new" money, is money or money's worth, and is necessary to this reorganization. As the Court has already found, this plan would not be feasible without that commitment.

The only remaining issue therefore is whether the new value equals or exceeds the value of the interest being retained. Judged from the perspective of a balance sheet, there is clearly no value to the equity interest being retained by the Debtor's equity owners. Collectively, they will own an asset that is worth no more than the secured debt against it, but it will cost them up to $2,000,000 to retain ownership of that asset that has no equity.

This simple mathematical analysis that there is no value to the interest being retained would suffice to satisfy that fifth prong of the new value corollary but for the case law indicating there is some additional but undefined and perhaps indeterminable value to the control of the asset.[1] While dictum in *Boyd* and *Case* indicates that such value exists and must be accounted for, there is virtually no case law nor economic theory indicating how the amount of that value should be determined.

The holding of *203 N LaSalle* implies, however, that such value can be determined by exposing the control of the asset to the marketplace, which can be done by termination of exclusivity. In this case, exclusivity has been terminated for almost a year. Yet during that time no other party in interest, particularly Wells Fargo, has proposed a competing plan. And although Wells Fargo was willing to expend funds both to purchase claims and to pay real

---

[1] Query whether this prong of the new value corollary has any significance after *Security Farms v. Teamsters*, 265 F.3d 869 (9th Cir. 2001), which found no violation of the absolute priority rule even though the debtor retained control of the union entity and, perhaps more significantly, the authority to establish and collect dues.

4

property taxes in an attempt to defeat confirmation, that does not suggest it would be willing to make anywhere near the $2,000,000 commitment made by the debtor's equity owners.

The conclusion that the $1,000,000 effective date new value exceeds the value of the interest being retained is also supported by the rate of return expected by equity investors (as estimated by the creditors' experts), when compared to a realistic estimate of what this equity ownership may be worth in five or ten years, based on realistic projections that are somewhere between those of the debtor and those of the creditor.

Ultimately, the new value corollary is but one aspect of the Code's "fair and equitable" requirement for confirmation over the objection of a class. Here, both the new value and the plan are eminently fair and equitable to Wells Fargo. Wells Fargo will be paid the entire value that it agrees the collateral has, and the debtor has no more value to contribute. Wells Fargo's currently nonperforming loan will become a performing loan, and at an interest rate almost double the contract rate. If the plan were not confirmed and Wells Fargo permitted to foreclose, the Court may take judicial notice that it would likely obtain far less at a foreclosure sale than the currently agreed fair market value of the property, and it would take many more months of maintenance and selling costs before Wells Fargo could sell the property for cash if it acquired it by credit bid. Compared to that and Wells Fargo's failure to propose any other plan, a plan that feasibly assures Wells Fargo of a fully secured, performing loan at a significantly increased interest rate is in no sense unfair or inequitable, even though the old equity owners are permitted to repurchase their ownership for $1 million effective date new value. And Wells Fargo will retain all the guarantees that it contracted for.

OTHER OBJECTIONS

As noted at the end of testimony, the Court finds that the facts demonstrate the plan[2] and its proponent comply with Title 11, the plan has been proposed in good faith, and the plan provides Wells Fargo with more than it could obtain in a chapter 7 liquidation. The Court also finds, based on the evidence, that retention of management as provided in the Plan is

---

[2] As amended on December 10, 2010.

Case 2:09-bk-16799-MCW    Doc 372    Filed 12/21/10    Entered 12/22/10 09:20:01    Desc
Main Document    Page 5 of 6

consistent with the interests of creditors and equity holders and complies with Code § 1129(a)(5). And as previously found and concluded in written decisions, the plan has been accepted by two impaired classes and their classification does not violate §§ 1122, 1129(a)(10), or any other provision of the Code.

Based on these findings and conclusions as well as those stated on the record, the Court finds and concludes that the plan satisfies all the requirements of § 1129 and therefore should be confirmed. Debtor's counsel is requested to upload an appropriate form of order, which will be the final, appealable order of confirmation.

DATED AND SIGNED ABOVE

Copy of the foregoing mailed/e-mailed
this 21st day of December, 2010, to:

Dale C. Schian, Esq.
Mark C. Hudson, Esq.
Schian Walker, P.L.C.
ecfdocket@swazlaw.com
Attorneys for Debtor

Susan G. Boswell, Esq.
Elizabeth S. Fella. Esq.
Quarles & Brady LLP
susan.boswell@quarles.com
elizabeth.fella@quarles.com
Attorneys for Wells Fargo Bank

 /s/ Pat Denk
Judicial Assistant